<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

PROFESSIONAL EMERGENCY MEDICAL SERVICES ASSOCIATION OF NEW JERSEY, IAFF LOCAL 4610, PFANJ, AFL-CIO,

    Plaintiff,

v.

MONMOUTH OCEAN HOSPITAL SERVICES CORPORATION (MONOC),

    Defendant.

Civil Action No. 13-2135 (MAS) (DEA)

**OPINION**

---

**SHIPP, District Judge**

This case involves a dispute between a union and a company as to the appropriate application of discipline pursuant the parties' collective bargaining agreement. The matter is before the Court on Defendant Monmouth Ocean Hospital Services Corporation's ("MONOC") motion for summary judgment on all claims asserted by Plaintiff Professional Emergency Medical Services Association of New Jersey, IAFF Local 4610, PFANJ, AFL-CIO ("PEMSA"). (ECF No. 37.) The Court has carefully considered the parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendant's motion is granted in part and denied in part.

**I.**     <u>Background</u>

MONOC is a non-profit hospital services corporation based in Wall, New Jersey, that provides medical transportation services. (Pl.'s Counterstatement of Material Facts ("PCSMF")

¶ 1, ECF No. 40-2.)[1] PEMSA is a labor union, also based out of Wall, and is the exclusive bargaining representative for a bargaining unit of full-time, part-time, and per diem MONOC employees that are the subject of this case. (*Id.* ¶ 2.) MONOC and PEMSA are parties to a collective bargaining agreement ("CBA" or the "Agreement") that covers the time period relevant to the discipline that is at issue. (*Id.* ¶ 3; Decl. of Stacy Quagliana ("Quagliana Decl."), Ex. 1, ECF No. 37-33.) During the relevant time period, MONOC issued various forms of discipline to four employees: Phil Kramer ("Kramer"), Alison Stephen ("Stephen"), Christopher Elliott ("Elliott"), and Lorre Schreiber ("Schreiber") (collectively, "Subject Employees").[2] (*Id.* ¶¶ 172, 325, 428, 434, 573.)

PEMSA has filed suit challenging MONOC's decision to discipline the Subject Employees.[3] PEMSA claims that MONOC's actions in imposing discipline on the Subject Employees violated the terms of the CBA, which imposes a "just cause" standard for all decisions to discipline or terminate employees. As a result, PEMSA has brought a claim for breach of the CBA under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). MONOC now moves for summary judgment with respect to all of the Subject Employees.

---

[1] For convenience, where the parties are in agreement and a fact is undisputed, the Court will cite either to (1) PEMSA's counterstatement of material facts (or PCSMF) (ECF No. 40-2), which responds to MONOC's statement of material facts (submitted with its moving brief) ("DSMF," ECF No. 37-2), or (2) MONOC's supplemental statement of material facts ("MSSMF," ECF No. 41-1), which responds to PEMSA's supplemental statement of facts (submitted with its opposition brief) (ECF No. 40-1). Where the parties are in disagreement as to a fact material to the Court's decision, it will be expressly noted.

[2] The factual specifics of each Subject Employee's discipline will be discussed in greater detail below.

[3] PEMSA also challenged discipline imposed on three other employees; PEMSA's claims, with respect to those employees, have previously been dismissed. (ECF No. 31.)

## II. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 422-23 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248). That is, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. The party moving for summary judgment has the initial burden of proving an absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the non-moving party bears the burden of proof at trial, the movant may discharge its burden by pointing out that there is a lack of evidence necessary to support the non-movant's claim. *Id.* at 325. Alternatively, a moving party may submit affirmative evidence that negates a material element of the non-moving party's claim. *Id.* "If the moving party meets the initial burden of showing that there is no genuine [dispute] of material fact, the burden shifts to the non-moving party to set forth specific facts showing the existence of such [a dispute] for trial." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The burden of persuasion, however, rests on the non-moving party to establish each element necessary to succeed on the claims on which it bears the burden of proof at trial. *Celotex*, 477 U.S. at 322.

To decide whether a genuine dispute of material fact exists, the Court must consider all facts, drawing all reasonable inferences in a light most favorable to the non-moving party. *See Kaucher*, 455 F.3d at 423. On a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine [dispute] for trial." *Anderson*, 477 U.S. at 249. Absent a genuine dispute for trial, summary judgment as a matter of law is proper.

### III. Discussion

Section 301, in addition to investing the Court with jurisdiction to decide the matter, requires that federal substantive law be applied in determining whether MONOC breached the CBA. *See Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 451-52, 456 (1957). Yet, "traditional rules of contract interpretation apply when not inconsistent with federal labor law." *Teamsters Indus. Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993). In evaluating whether MONOC breached the CBA, the Court must determine whether the relevant terms of the CBA are ambiguous. Whether terms of a collective bargaining agreement are ambiguous is a question of law. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir. 1990).

> To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we hear the proffer of the parties and determine if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning. These basic principles of contract construction are not inconsistent with federal labor policy.

*Rolls-Royce Motor Cars*, 989 F.2d at 135 (internal citations and quotation marks omitted). Normally, where contract terms are ambiguous, a triable question of fact exists, and summary

judgment is inappropriate. *Heffron v. Adamar of N.J., Inc.*, 270 F. Supp. 2d 562, 574 (D.N.J. 2003).

Plaintiff asserts that the parties dispute the meaning of "just cause," as used in the CBA, precluding summary judgment. The CBA provides that MONOC "retains and reserves unto itself, without limitation, . . . the . . . right[]. . . . [t]o remediate, counsel, suspend, demote, discharge, or take any other appropriate disciplinary action *for just cause* against any employee consistent with the terms of this Agreement, subject to the grievance procedure." (CBA art. 4(A)(v) (emphasis added).) Because the parties dispute the meaning of this term, Plaintiff argues, the term is ambiguous and summary judgment is inappropriate.

The Court does not agree. On the contrary, a dispute between the parties as to the meaning of a term does not *ipso facto* render it ambiguous. Furthermore, a "just cause" standard for discipline or termination is a common characteristic of many collective bargaining agreements. *See, e.g., United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 378, 380-81 (3d Cir. 1995) (discussing the meaning of "proper cause" standard for discipline under collective bargaining agreement). Its presence in the CBA, standing alone, cannot preclude the entry of summary judgment. Moreover, whether the "just cause" standard is ambiguous must be determined in light of other provisions within the CBA. *Rolls-Royce Motor Cars*, 989 F.2d at 135-36. Accordingly, the Court evaluates MONOC's treatment of each employee at issue in light of the "just cause" standard, which the parties agree is an objective standard, as well as the other provisions of the CBA that are relevant to the circumstances of each employee's discipline. Indeed, the "just cause" standard is couched in terms that require its interpretation with deference to the remainder of the CBA. (*See* CBA art. 4(A)(v) (stating that MONOC "retains and reserves unto itself, without limitation, . . . the . . . right[]. . . . [t]o remediate, counsel, suspend, demote,

5

discharge, or take any other appropriate disciplinary action *for just cause* against any employee *consistent with the terms of this Agreement*, subject to the grievance procedure." (emphasis added).)

### A. Phil Kramer

In November 2012, Kramer's employment was terminated after he reported for duty and then subsequently left the jobsite after refusing to work with another staff member, namely Registered Nurse ("RN") McConnon, and for abandoning his assigned shift. (PCSMF ¶¶ 172-73.) For the most part, the parties are in agreement as to the underlying factual circumstances of Kramer's employment and termination. From the beginning of Kramer's employment with MONOC until November 2011, he worked as an Emergency Medical Technician ("EMT"); from November 2011 until his termination, he worked as a per diem EMT. (*Id.* ¶¶ 103, 105.) As part of his job description, Kramer "was required to interact appropriately with all MONOC management, EMS personnel, hospital personnel, public safety personnel, and members of the public." (*Id.* ¶ 110.) Kramer, who previously represented PEMSA members in disciplinary proceedings at MONOC as a PEMSA delegate, was familiar with the CBA, which was in effect at the time of his termination, and received a copy during his employment. (*Id.* ¶¶ 111-13, 117.)

On November 1, 2012, days after Hurricane Sandy hit New Jersey and while New Jersey was in a State of Emergency, Kramer was scheduled to work a shift starting at 9:00 am, and was to report to MONOC's headquarters. (*Id.* ¶¶ 140-41, 144.) The day before, MONOC Operations Manager Geoffrey George ("George") requested that Kramer report to work three hours early, or 6:00 am, to fill an open shift. (MSSMF ¶ 151.) On November 1, Kramer arrived at 5:30 am, before the start of his scheduled shift, but did not see his name on the board, or the screen that identifies who is staffed on what shifts for that day (the "Board"); as a result, he went to speak

with George, who informed him that he had left him off the Board in error. (PCSMF ¶¶ 147-49; MSSMF ¶ 167.) In Kramer's own words, the conversation proceeded as follows:

> Geoff George . . . acknowledged that yes, he asked me to come in early, and I said, "Where do you want me?" And he looked at his schedule, looked at the schedule, and he said he wanted me to work a 6 a.m. to 6 p.m. shift on a truck that was fully staffed. I told him we discussed the day before that I don't want to work a 12-hour shift. I had already worked 25 extra hours that week, and that the shift that I came in to work was still open, and he said, "Well, you're gonna work with Gene [McConnen]."
> And I said, "No, I won't."
> He said, "Well, if you don't, you're suspended."
> And I said, "Have a nice day."

(Cert. of Matthew Clark ("Clark Cert."), Ex. E., Kramer Dep. 17:23-18:12, ECF No. 40-8.)[4] Kramer then left the jobsite. (PCSMF ¶ 158.) On November 6, 2014, by Notice of Employee Action, Kramer was terminated for "refus[ing] to work with the partner [he] [was] assigned and . . . [for] abandon[ing] [his] position." (*Id.* ¶¶ 172-73.)

The parties disagree, however, with regard to the CBA's application to Kramer's termination. PEMSA asserts that Kramer's termination violated the CBA because he was not terminated for just cause. According to PEMSA, because Kramer believed that he was not scheduled to work on November 1, he was entitled to decline the assignment. In addition, PEMSA argues that other employees declined assignments and did not receive as harsh discipline as a result, and rather, Kramer was disciplined due to a personal animus, which precludes a finding of just cause with regard to Kramer's termination.

The Court disagrees. The CBA contains several provisions, identified by MONOC, that, in no uncertain terms, allow MONOC to terminate Kramer for the subject misconduct. As a

---

[4] The Court notes that PEMSA, in its supplemental statement of material facts, grossly misrepresents the nature of Kramer's deposition testimony, quoted above. (Pl.'s Supplemental Statement of Material Facts ¶ 168, ECF No. 40-1 ("Kramer testified that after approaching George about a work assignment, George 'asked' him to work a twelve (12) hour shift . . . .").)

starting point, in specific circumstances, the CBA allows MONOC to terminate or discharge an employee based on a single instance of bad conduct and without requiring the imposition of progressive discipline. Article 6(1), subpart E of the CBA lists twenty-five different infractions that, if violated, permit MONOC to immediately discharge an employee, among them, "[t]he refusal by an employee to follow the directives and instructions of Management concerning a work-related matter, absent an objective belief that the directive is patently illegal, immoral, or would result in direct and immediate harm to a patient or other person." (CBA art. 6(1)(E)(xvi).) In addition, under the CBA, MONOC retains the right "to determine work schedules and shifts, to decide the number of employees needed for any particular time and to be in sole charge of the quality and quantity of work required." (*Id.* art. 4(A)(ii).) Moreover, Article 9, which governs hours and overtime, provides that "[w]orking days and/or hours for employees are established and revised from time to time at the discretion of a Regional Director" as needed, and while "[e]mployees shall be provided with thirty (30) days advanced [sic] notice of a permanent or long term . . . change in their regularly scheduled shift," thirty-days' notice is not required in three different circumstances, all of which are applicable to Kramer: during "a declared state of emergency," when the change is temporary, or when the employee is per diem. (*Id.* art. 9(A), (B)(i)-(iii).)

  Here, Kramer, who, as a former PEMSA delegate, was on notice of the terms of the CBA, refused to staff a shift, in disregard of his supervisor's directive. MONOC was within its rights under the CBA to change Kramer's schedule, particularly in light of the existing State of Emergency. Kramer reported for a shift set to start at 6:00 am, for which his supervisor, George, had asked him to report for the day prior, and upon arriving at MONOC's headquarters, Kramer spoke with George, his supervisor, who informed him that he would be staffed on another 6:00 am

8

shift. Kramer refused to fill that shift and left the premises. Although PEMSA identifies another employee who may have received different treatment for similar conduct, under the express terms of the CBA, MONOC may, "in its sole discretion[,] . . . consider mitigating circumstances and determine a lesser penalty is warranted" for a terminable offense. (*Id.* art. 6(1)(E).) As a result, based on the above undisputed facts and the plain unambiguous terms of the CBA, MONOC possessed just cause to terminate Kramer and is entitled to summary judgment on PEMSA's section 301 claim, as it relates to Kramer.

### B. Alison Stephen

Stephen, a Mobile Intensive Care Nurse, was terminated after she accumulated a requisite number of disciplinary units, which were dispensed as a result of her involvement in three separate motor vehicle accidents while driving a MONOC ambulance. Here, again, the facts surrounding Stephen's discipline and termination are largely undisputed. Stephen worked at MONOC as a Mobile Intensive Care Nurse ("MICN") from April 1997 until her termination on January 15, 2013. (PCSMF ¶¶ 248, 252, 325.) In the six months preceding her termination, Stephen was involved in three separate motor vehicle accidents while driving a MONOC ambulance, the final of which occurred on January 9, 2013, and precipitated her termination. (*Id.* ¶¶ 292, 325.) The first two accidents occurred within two months of each other and resulted in violations of MONOC Policies 703 and 706, respectively; Stephen received a total of four disciplinary units as a result.[5] (*Id.* ¶¶ 294, 302-303, 306.) Neither Stephen nor PEMSA filed a grievance with respect to the first

---

[5] The two disciplinary points allocated to Stephen as a result of the second accident were "stayed" by MONOC management, within the terms of the CBA, which results in the withholding of the proposed discipline, and its ultimate cancellation, if the employee does not receive any additional discipline within a one-year period. (PCSMF ¶¶ 304-05, 307; CBA art. 6(1)(C)(iv).) These points were ultimately issued to Stephen, however, because Stephen's third accident resulted in additional discipline. (*See* Quagliana Decl, Ex. 38.)

two accidents and the resulting discipline. (*Id.* ¶¶ 299-300, 313.) Then, on January 9, 2013, Stephen was involved in her third accident. According to MONOC,[6] Stephen drove through an intersection, through a red light, and struck another vehicle traveling through the intersection, causing injury to her partner and the driver of the other vehicle, as well as causing significant damage to the ambulance (which was deemed a total loss) and to two other parked cars. (DSMF ¶¶ 319, 322-23.) Stephen does not dispute being at fault for the accident. (PCSMF ¶ 318.) On January 15, 2013, MONOC issued to Stephen notice that, as a result of the most recent accident, she had accumulated twelve or more disciplinary units, which resulted in her termination.[7] (*Id.* ¶ 325.) PEMSA concedes that Stephen accumulated the requisite number of disciplinary units for termination. (*Id.*; *see also* Daley Dep. 156:15-18, ECF No. 37-7.) This result was submitted to the CBA's grievance procedure and ultimately upheld. (*Id.* ¶ 349.)

Plaintiff puts forth a litany of reasons why MONOC lacked just cause for Stephen's termination. For one, PEMSA asserts that MONOC failed to conduct an in-depth investigation of the January 9 accident. In addition, PEMSA contends that Stephen "more than likely" was operating the siren at the time of the accident but that it was turned down so that Stephen and her partner could communicate with emergency dispatch. (Pl.'s Opp'n Br. 36, ECF No. 40.) PEMSA states that Stephen's partner was forced to use his personal cell phone to communicate with dispatch because the ambulance was not properly equipped, which contributed to the accident.

---

[6] PEMSA disputes all aspects of MONOC's description of the January 9 accident, excluding the date, but offers no competing description of the accident. (PCSMF ¶¶ 319-20.) Stephen, during her deposition, recalled very little regarding the accident. (*See* Cert. of David A. Tango ("Tango Cert."), Ex. O, Stephen Dep. 127:22-128:07, ECF No. 37-19.)

[7] MONOC's notice included within Stephen's accumulated discipline units that were wrongly attributed to her as a result of a ticket received for a red light camera violation. These units, however, were ultimately removed, and Stephen still possessed twelve or more disciplinary units. (PCSMF ¶¶ 332-33.)

PEMSA also asserts that MONOC did not properly handle Stephen's driving performance, because MONOC inconsistently enforces its policy that requires employees to complete an ambulance maneuvering course on an annual basis. Last, PEMSA offers that MONOC did not conduct a comprehensive review of Stephen's other two accidents. All of these issues, PEMSA asserts, show that Stephen's termination was not for just cause.

The Court finds that MONOC possessed just cause to terminate Stephen. The CBA provides that the accrual of twelve or more active disciplinary units results in termination of employment. (CBA art. 6(1)(D)(v).) PEMSA concedes that Stephen accumulated twelve or more disciplinary units. All of PEMSA's asserted reasons in support of their position that just cause was lacking do not negate Stephen's accumulation of disciplinary units. Moreover, none of PEMSA's proffered arguments negate the fact that Stephen has not denied fault with regard to the accident. Accordingly, summary judgment is appropriate, insofar as Plaintiff's section 301 claim applies to Stephen.

### C.     Christopher Elliott

Elliott, a full-time EMT with MONOC since 2003, received four disciplinary units and administrative counseling in connection with an incident occurring in August 2012 and his reporting of the incident (or lack thereof). (PCSMF ¶¶ 373, 417, 431.) In August 2012, Elliott carried a hospice patient in his arms, rather than on a stretcher or other mode, from the backdoor of the patient's house to the patient's bedroom. (*Id.* ¶ 417.) It is undisputed that this conduct violated MONOC Policy No. 726, which prescribes certain procedures and methods for carrying patients. (*Id.* ¶¶ 398-400, 430.) In addition, MONOC issued additional discipline, in the form of required administrative counseling, for not filing an incident report in connection with this incident. (*Id.* ¶¶ 434, 439.) Elliott is still employed by MONOC. (*Id.* ¶ 374.)

Plaintiff's objection to the discipline units issued to Elliott is straightforward: PEMSA asserts that MONOC never established that Elliott's conduct in moving the patient in question caused physical harm to the patient, precluding the discipline imposed. The CBA states that four discipline units are to be "issued in response to infractions of policies and procedures that result in physical harm to a person" in the first instance of a violation.[8] (CBA art. 6(1)(C)(iii)(a).) Contrary to PEMSA's assertion that there was no evidence that Elliott caused harm to the patient, it is undisputed that, when Elliott picked up the patient using his arms, the patient complained of pain. (PCSMF ¶ 421.) In addition, MONOC received a complaint from the patient's wife that Elliott's handling of the patient caused him to suffer pain and aggravated an existing back injury. (*Id.* ¶ 416.) While PEMSA disputes the veracity of the complaint, it is still evidence that tends to show that Elliott's conduct caused harm to the patient. The CBA provides that MONOC is vested with discretion in evaluating the credibility of those providing information related to discipline and in placing weight on certain sources of information. (CBA art. 6(1)(B).) Accordingly, here, where there was information tending to show that Elliott's actions, in violation of company policy, caused a patient pain, and where Elliott himself admitted that his actions caused the patient pain (Elliott Dep. 210:19-21) and he expressed contrition for those actions (*id.* at 216:13-218:19), the Court cannot say that MONOC did not possess just cause for the imposition of the four disciplinary units.

PEMSA, while identifying the imposition of administrative counseling as a basis for its section 301 claim in its amended complaint (*see* Am. Compl. ¶¶ 53-61), does not oppose the

---

[8] As the Court understands the argument, PEMSA does not dispute the meaning of the term "harm" and whether the causing of pain results in harm, but rather disputes whether Elliott's conduct caused the patient to feel additional pain; PEMSA does not contend that the term "harm" is ambiguous. Regardless, the Court holds that, under the terms of the CBA, the term "harm" includes the infliction of pain. Harm is defined as "physical or mental damage" or an "injury," which is defined as "an act that damages, harms, or hurts." *Webster's New Int'l Dictionary* 1034, 1164 (3d 1986).

portion of MONOC's motion that seeks summary judgment on that aspect of the claim. In any event, Elliott himself conceded at his deposition that it was an unusual occurrence to carry a patient in his arms, which, per the Court's reading of MONOC's Policy No. 111 and Elliott's own admission, requires the completion of incident report. (Elliott Dep. 201:13-202:18; PCSMF ¶ 415.) It is undisputed that Elliott did not complete an incident report. (PCSMF ¶ 437.) Accordingly, MONOC is entitled to summary judgment on the entirety of PEMSA's claim, as it relates to Elliott.

### D. Lorre Schreiber

Schreiber, currently employed as a full-time Paramedic with MONOC, received two disciplinary units in connection with having called out for a scheduled shift the day prior. (*Id.* ¶¶ 541-42, 573, 576.) On September 7, 2012, Schreiber called the Operations Manager, George, and informed him that she could not work her shift the following day because of a scheduling conflict. (*Id.* ¶ 610.) George deemed her reason for calling out unacceptable, and as a result, on September 24, 2012, MONOC issued a Notice of Employee Action, which indicated that Schreiber was being issued two disciplinary units because the callout resulted in an economic loss to MONOC. (*Id.* ¶¶ 601-02, 611.) MONOC claims that Schreiber calling out required it to fill the shift with an RN, and RNs are paid substantially more than paramedics. (*Id.* ¶¶ 601-02.)

PEMSA asserts that MONOC has not carried its burden in demonstrating that it possessed just cause to issue two discipline units to Schreiber under Article 6(1) of the CBA because MONOC, of its own volition, filled Schreiber's shift with a higher paid employee, thus causing an economic loss. The Court agrees.[9] As previously discussed, the CBA provides that two discipline

---

[9] PEMSA also claims that George's determination—that Schreiber's reason for the callout was unacceptable—was arbitrary, precluding a finding of just cause. Because the Court finds that

units are to be issued where a policy violation "*result[s]* in damage to or loss of company-owned equipment/supplies or other economic interest." (CBA art. 6(1)(c)(ii) (emphasis added.) MONOC contends that it was *required* to replace Schreiber with an RN, a higher paid employee, thus incurring economic damage. (DSMF ¶ 601.) PEMSA, however, disputes whether MONOC was in fact required to replace Schreiber with a higher paid employee (PCSMF ¶ 601), and MONOC has not further substantiated its position.

With regard to Schreiber, MONOC has not sustained its burden on summary judgment. The CBA states that two disciplinary units are issued where a policy violation "result[s]" in economic harm to the company. (*See* CBA art. 6(1)(c)(ii).) Based on this language, it is unclear whether discipline is appropriate only if the employee's conduct was the direct cause of economic harm, or whether an intervening decision by MONOC may play a role. The parties have not provided any additional evidence in furtherance of the interpretation of this ambiguous provision. As a result, whether MONOC was actually required to replace Schreiber with a higher paid employee is material to whether there was just cause to issue the two disciplinary units, and based on the parties' submissions to the Court, it cannot be determined whether MONOC had other options in replacing Schreiber. Accordingly, the Court finds that MONOC has not sustained its burden on summary judgment, and its motion, insofar as it relates to Schreiber, is denied.

---

summary judgment, with respect to Schreiber, is inappropriate on other grounds, it need not reach this issue.

## IV. Conclusion

Accordingly, for the above reasons, MONOC's motion for summary judgment is granted in part and denied in part. An order reflecting this decision will be filed contemporaneously with this opinion.

/s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Date: June 30th, 2015

15